502

## Kislosky v. Helicke

*Bernard Markovitz,* for plaintiffs.
*John DeAngelic,* for defendants.

FLAHERTY, *J.,* March 3, 1977 — Before the court is a petition to stay and/or set aside execution and/or open or strike confessed judgment. Plaintiffs oppose the granting of the rule, and, thus, it is tantamount to a demurrer to the petition, the court accepting as true, for the purposes of determining whether or not to grant the rule, all of the allegations well pleaded in the petition.

It is alleged that the parties entered into an installment mortgage land sale agreement for the purchase and sale of certain realty for a consideration of $7,000 under the terms whereof the purchasers, defendants, have been in continuous possession and residence from a time prior to the entering into the agreement. Payments have been

made by virtue of the terms of amortization which appear in the agreement and defendants allege to have paid a sum in excess of $6,960 over a period of almost seven years.

The judgment in question results from an amicable action in ejectment and confession of judgment. The money damages confessed are in excess of $400. The petition alleges that the defendant Edward Helicke has been out of work since April of 1976, does not have a telephone or automobile, and, communicated with plaintiffs and their attorney by mail and through a sister of defendant Edward Helicke. It is admitted that the petitioners failed to make payments for August and September, 1976, in an amount slightly less than $170. However, it is alleged that a tender was made after the due date, but refused, and a further tender was made for what is alleged to be the entire amount due, to wit $340 and that this was also refused.

Counsel for plaintiffs argues that, inasmuch as there is an admission that a default did in fact occur, a meritorious defense is not alleged in the petition, and, according to the maxims *aequitas sequitur legem et aequitas nunquam contravenit legis*, equity, thus, has no jurisdiction to provide relief in this instance, inasmuch as there is alleged no legal right. This chancellor, however, does not agree.

It is in the nature of man existing in a collective society to strive for that end which we conceptualize as justice. The law exists as the means which society develops to approach the conceptual ideal, which, in the end, is justice. This member of the court sits in this case, as a chancellor in equity, not a judge at law, and, it is necessary to make reference to the origin of that dichotomy to correctly dispose of this adjudication.

Our system of justice evolves quite directly from the forces set in motion concomitant with the Norman Conquest, and, it was during the reign of Henry II that the formal nucleus of our present system can be recognized. It was at the end of that reign that a *curia regis* (King's Bench) was in reality a court of law as we would now know it, and this court is directly descended therefrom. The writs of the common law, as time developed, became defined, and at least at the beginning of the thirteenth century were thought sufficient to meet any situation. Conceptually the King remained as, ". . . the fountain of all justice." The chancellor, the most important and powerful officer of State, next only to the King, an ecclesiastic, was the keeper of the King's conscience. The writs of the common law became steeped in technicalities, and, because form ruled over substance, the system of law, so nobly instituted, completely broke down. With the breakdown of the common law, petitions to the King's Council or to the King were repeatedly referred to the chancellor to determine and to do justice, the only guidelines being reason and conscience, the chancellors subscribing to the maxim, *aequum et bonum est lex legum.* It was in the thirteenth century, as chancery became part of the common law jurisdiction, that petitions involving the King's prerogative were directed to the chancellor as a matter of course so that justice would be done according to ". . . what ought to be done," or "what justice demands," or, according to "law and reason." It was during the fourteenth century that the equitable jurisdiction of chancery was substantially developed, and it was during the fourteenth century that most of

the principles and maxims which have been followed over the centuries were first espoused. It is true that one of these maxims, which is the touchstone of equity, is *aequitas sequitur legem,* but it is also inherent in the concept of justice that what is equitable and good is the law of laws. *Aequum et bonum est lex legum.* Hob. 224.

Since the fourteenth century, therefore, equity, transcending the law, exercised jurisdiction to prevent the courts of law from giving effect to clauses in a contract which call for forfeiture, where the forfeiture is prescribed for the non-payment of money. The ancient predecessors of this chancellor developed the principle that where a purchaser has an admitted equitable interest, such as in the case at Bar, there is no reason why a forfeiture should be permitted merely for a technical delay in money payment, inasmuch as the harm may be covered by an allowance of interest. This doctrine developed parallel to the law with respect to forfeiture in the case of mortgages and conditional estates. Vernon v. Stephens, 2 P. Wms. 66, 24 Eng. Rep. 642. In Richmond v. Robinson, 12 Mich. 195 (1863), the court said "nor will it [equity], by any stipulation of the parties, be ousted of its jurisdiction, or refuse to relieve against the exaction of the pound of flesh, although the parties have, in express terms, stipulated for it." 30 C.J.S. 888-9, states as follows: 8889, states as follows:

"Equity abhors forfeitures and beyond any question has jurisdiction, which it will exercise in a proper case, to grant relief against their enforcement.

"The jurisdiction to relieve against forfeitures is exercised on the principle that a party having a legal right shall not be permitted to avail himself of it for purposes of injustice or oppression."

Were the parties in this case to have executed a mortgage, rather than a long term agreement, the statutory law of our Commonwealth provides for curing of defaults: Act of January 30, 1974, P.L. 13 (N. 6), 41 P.S. §404. Although it is true that the legislature did not make provision for one purchasing under an agreement of sale, but used the language "residential mortgage," it certainly cannot be construed as an intent on the part of the legislature to abrogate centuries of equitable development. Pennsylvania has adopted this general principle of equitable development, i.e., equitable relief against forfeitures, which is thoroughly established by the decisional law of this Commonwealth.

Thus it is that an equitable defense is available under the pleaded facts of the petition, and, the chancellor will enter the rule.

## ORDER

And now, March 3, 1977, upon presentation of the petition to stay and/or set aside execution and/or open or strike confessed judgment, argument thereon in which both parties were represented by counsel, it is hereby ordered and decreed that the execution at GD77-01888 is stayed and a rule is directed to issue to plaintiffs to show cause why the judgments entered at GD77-01887 should not be opened or stricken, and defendants let into an equitable or legal defense.